**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-CR-00544-1** |
| | ) | |
| **LUIS EDUARDO GONZALEZ-GARCIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM AND**
**OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

**NOW COMES,** the Defendant, **LUIS EDUARDO GONZALEZ-GARCIA,** by and through his attorneys, **RICHARD M. BEUKE** and **TIMOTHY M. BLACK,** and pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), the Sixth Amendment to the Constitution of the United States, and the Order entered by this Court on June 28, 2022 (Doc. 93), respectfully submits the following Sentencing Memorandum and objections to the Presentence Investigation Report ("PSR") in support of his request for the statutory mandatory minimum sentence of incarceration for ten years, followed by five years of supervised release. Such a sentence is sufficient, but not greater than necessary to meet the goals of sentencing, and in support thereof, Mr. Gonzalez-Garcia states the following:

## I.   INTRODUCTION

Luis Eduardo Gonzalez-Garcia is a family man, a business man, and a remorseful man. He has spent his entire life contributing to and providing for his family and now he faces the prospects of living away from them for an extended period of time in a foreign prison. While he is certain that he is not defined by the decisions he made later in his life and knows his legacy is greater than the sum of his worst actions, he is painfully aware of the missteps and mistakes that have led him

1

to this Court for sentencing. For those decisions, those actions, those missteps, and those mistakes, Luis Eduardo Gonzalez-Garcia will forever be sorry. It is with an understanding of all of the good he has done in his life, notwithstanding the crimes he has committed, that he humbly and respectfully asks this Court to fashion a sentence that is below the statutory advisory guideline, below the recommendation of United States Probation, and commensurate with the sentences given to his co-conspirators.

On May 24, 2018, Luis Eduardo Gonzalez-Garcia was travelling home to Cerralvo, Mexico, from El Salvador, where he went to purchase calves at auction for his family's ranch. When he arrived at the airport in Guatemala City, he expected to board a flight back to Mexico. Instead, he was greeted by a team of DEA Agents from Chicago. He did not flee, he did not attempt to conceal his identity, and he did not fight. He agreed to sit down with the Agents, accompany them to the United States (where he was neither a citizen nor a legal permanent resident), and spend the night with them upon arrival in Rosemont, Illinois. The next morning, he agreed to give another statement to the DEA Agents.

It was not until after Mr. Gonzalez-Garcia gave a statement to the DEA Agents in Rosemont that he learned about an eight-count indictment that had been filed under seal nine months earlier alleging that he participated in a conspiracy to possess with intent to distribute and distribute 5 kilograms ("kg") or more of cocaine in violation of 21 U.S.C. § 846 (Count I), conspiracy to import 5 kg or more of cocaine into the United States in violation of 21 U.S.C. § 952(a), 21 U.S.C. § 960(a)(1), and 21 U.S.C. § 963 (Count II), five counts of possession with intent to distribute 5 kg or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts III-VII), and conspiracy to launder drug proceeds in violation of 18 U.S.C. § 1956 (Count

VIII). Mr. Gonzalez-Garcia was arrested and taken to the Metropolitan Correctional Center ("MCC") in Chicago, where he has remained to this date.

On May 29, 2018, Mr. Gonzalez-Garcia pled not guilty to the charged crimes. For the next four years, he reckoned with the decisions he had made that led him to the MCC in a city 1,500 miles away from his family. Ultimately, he came to the conclusion that it was time to take responsibility for his role in the conspiracy described in the Indictment, and found comfort in the notion that if he was going to plead guilty, he would have the opportunity to correct some of the lies told by his co-conspirators and share his perspective of what happened. Thus, on August 18, 2021, and again on October 14, 2021, he shared that story with the United States Government in a series of proffer sessions categorized by the Government as "truthful." *See* Government's Version of the Offense (Doc. 87, Ex. 1). Then, on March 16, 2022, Mr. Gonzalez-Garcia changed his plea to Guilty with respect to Counts One and Eight of the Indictment (Doc. 83), entered a Plea Declaration (Doc. 84), and began preparing to face the consequences of his actions.

## II.    STATUTORY PENALTIES

As a preliminary matter, the statutory penalties for the crimes to which Mr. Gonzalez-Garcia has pled guilty are as follows:

- Count 1 carries a statutory mandatory minimum sentence of 10 years with a maximum of life. 21 U.S.C. § 846; *see* 21 U.S.C. § 841(b)(1)(A)(ii). Count 8 carries no statutory mandatory minimum sentence, and provides for a maximum term of 20 years of imprisonment. 18 U.S.C. § 1956(h); 18 U.S.C. § 1956(a)(1). He is not eligible for a sentence of probation. 18 U.S.C. § 3561.

- With respect to supervised release, for <u>Count 1</u> the Court can impose a term that lasts anywhere from 5 years to life. 21 U.S.C. § 846; *see* 21 U.S.C. § 841(b)(1)(A)(ii). <u>Count 8</u> allows for a term of supervised release no longer than 3 years. 18 U.S.C. § 1956(a)(1).

- The maximum fine that can be imposed for <u>Count 1</u> is $10,000,000, 21 U.S.C. § 846; *see* 21 U.S.C. § 841(b)(1)(A)(ii), while the maximum fine for <u>Count 8</u> is $500,000, 18 U.S.C. § 1956(a)(1). The Court must also impose a special assessment of $100 on each count to which he pled guilty. 18 U.S.C. § 3013.

In sum, the Court may impose a sentence of imprisonment from 10 years to life, may impose a period of supervised release from 5 years to life, and may order payment anywhere from $200 to $10,500,200.

### III.   SENTENCING GUIDELINE CALCULATIONS[1]

The sentencing guideline range applicable in this case was briefly addressed in Mr. Gonzalez-Garcia's Plea Declaration, (Doc. 84), was briefly discussed in the Government's Version of the Offense (Doc. 87, Ex. 1), and was contemplated at length in the Presentence Investigation Report ("PSR") prepared by United States Probation Officer Danielle Stern (Doc. 87). The Government and Ms. Stern have both correctly calculated Mr. Gonzalez-Garcia's criminal history score as zero (0), placing him in a Criminal History Category of I. However, as outlined below, the Government's calculation of 45 and Ms. Stern's calculation of 43 for his Total Offense Level is high, as the appropriate offense level in this case is 37. Regardless of the calculation used by the Court, Mr. Gonzalez-Garcia humbly asks this Court to administer a sentence below the guideline range calculation.

### a.   Count 1 – Base Offense Level

---

[1] The November 2021 Guidelines Manual is currently in effect and shall be used to calculate the applicable guideline range. U.S.S.G. § 1B1.11.

In Count 1, Mr. Gonzalez-Garcia pled guilty to conspiring to possess with intent to distribute and to distribute more than 450 kg of cocaine in violation of 21 U.S.C. § 846. Pursuant to Sections 2D1.1(a)(5) and 2D1.1(c)(1) of the United States Sentencing Guidelines Manual ("Sentencing Guidelines"), the base offense level for Count 1 is <u>38</u>. U.S.S.G. § 2D1.1(a)(5) and § 2D1.1(c)(1).

**b.** <u>**Count 1 – Specific Offense Characteristic (b)(12)**</u>

Section 2D1.1(b)(12) of the Sentencing Guidelines requires a 2-level increase in the offense level where the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G § 2D1.1(b)(12). Both the Government and Ms. Stern incorrectly accuse Mr. Gonzalez-Garcia of maintaining warehouses along the Texas/Mexico border for the storage and staging of bulk quantities of cocaine and bulk cash proceeds derived from the sale of cocaine. (Doc. 87; Doc. 87, Ex. 1).

The 2-level enhancement does not apply to Mr. Gonzalez-Garcia because he did not maintain a premises for the purpose of distributing a controlled substance. There is no question that some of Mr. Gonzalez-Garcia's co-conspirators maintained premises for the purpose of distributing a controlled substance, but that was not Mr. Gonzalez-Garcia's role in the conspiracy. Thus, his guideline calculation should not include the 2-level increase pursuant to 2D1.1(b)(12).

Application Note 17 to Section 2D1.1 of the Guidelines directs the court that "[a]mong the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." U.S.S.G. § 2D1.1 cmt. n. 17. Mr. Gonzalez-Garcia neither held a possessory interest in nor controlled access to, or activities at any of the warehouses maintained by his co-conspirators.

As detailed in his Plea Declaration, (Doc. 84), each member of the conspiracy performed a different role: Mr. Gonzalez-Garcia was consulted to establish logistics for moving narcotics from Mexico to the United States, and for moving proceeds back from the United States to Mexico; Jesus Arredondo-Alvarez, Agustin Patricio, Noemi Rosales-Sanchez, and Luis Garcia were all tasked with procuring and managing operations at the warehouses in the United States.

In the Government's Version of Events, the Government spliced three incongruent snippets from an extensive Blackberry Messenger conversation between Mr. Gonzalez-Garcia and Jesus Arredondo-Alvarez, translated from Spanish to English, as evidence that Arredondo-Alvarez operated his warehouses *at the direction* of Mr. Gonzalez-Garcia. (Doc. 87, Ex. 1, p. 20-22). That is not what those conversations show. It is clear that Mr. Gonzalez-Garcia's role was to get product to the United States, and once it was there, it was Jesus Arredondo-Alvarez's job to house the product until it could be moved – to maintain the warehouses. The fact that Mr. Gonzalez-Garcia expressed the need for a warehouse and the fact that he wanted to see pictures of the area outside the warehouse do not evince a possessory interest or a controlling interest in the warehouses – they simply show an interest. Similarly, the Government argues that Mr. Gonzalez-Garcia "directed" Jesus Arredondo-Alvarez to lie to the owners, but the translation shows that he was merely offering a suggestion. There is not evidence that Mr. Gonzalez-Garcia "directed" Jesus Arredondo-Alvarez or that Jesus Arredondo-Alvarez took Mr. Gonzalez-Garcia's advice.

Mr. Gonzalez-Garcia does not deny that premises were maintained by members of the conspiracy to which he was a party for the purpose of distributing a controlled substance, or denigrate the seriousness of that fact. However, Mr. Gonzalez-Garcia was not the person that maintained those premises, thus the 2-level enhancement should not apply.

c. **Count 1 – Specific Offense Characteristic (b)(16)(C)**

Section 2D1.1(b)(16)(C) of the Sentencing Guidelines requires a 2-level increase in the offense level where "the defendant receives an adjustment under §3B1.1 (Aggravating Role) and . . . the defendant was directly involved in the importation of a controlled substance." U.S.S.G § 2D1.1(b)(16)(C). Both the Government and Ms. Stern incorrectly apply this 2-level increase because, as discussed below, they both incorrectly classify Mr. Gonzalez-Garcia as having an "Aggravated Role" in the conspiracy pursuant to Section 3B1.1 of the Sentencing Guidelines. (Doc. 87; Doc. 87, Ex. 1).

### d. Count 1 – Adjustment for Role in the Offense

Section 3B1.1 of the Sentencing Guidelines requires a 4-level increase in the offense level if the defendant was "an organizer or leader" in the charged conspiracy, or a 3-level increase if the defendant was "a manager or supervisor (but not an organizer or leader)" in the charged conspiracy. Both the Government and Ms. Stern incorrectly accuse Mr. Gonzalez-Garcia of holding an "organizer or leader" role in the charged conspiracy.

Mr. Gonzalez-Garcia was a participant in the conspiracy. He was recruited to join the drug trafficking business because of knowledge about moving goods across the border he developed over decades of legitimate business enterprises. Knowing nothing about the drug trade, but needing money to support his family and his dream of converting his family's ranch into an ecotourism project, Mr. Gonzalez-Garcia regrettably agreed to join the conspiracy.

Mr. Gonzalez-Garcia did not have a network of drug traffickers, drug suppliers, or drug distributors at the ready, and was not responsible for such recruitment. To the extent he had any authority to tell anyone else what to do, it only related to advice based upon his knowledge in moving goods across the border. He was occasionally tapped as a resource for opening front companies in the United States or renting warehouses in the United States, because his previous

7

business ventures taught him those skills. However, he was never in charge of warehouse rental, was never in charge of opening front companies, and never held any authority or power over anyone who was. Each member of the conspiracy had their own job, and Mr. Gonzalez-Garcia's job was to coordinate the transportation of narcotics from Mexico to Texas. He neither organized nor led the endeavor, and his sentence level should not be enhanced for doing so.

    **e.   Count 1 – Adjusted Offense Level**

When all of the adjustments listed above are considered, Mr. Gonzalez-Garcia's Adjusted Offense Level for Count I remains at <u>38</u>.

    **f.   Count 8 – Base Offense Level**

In Count 8, Mr. Gonzalez-Garcia pled guilty to conspiring to commit money laundering in violation of 18 U.S.C. §1956(h). Pursuant to U.S.S.G. § 2S1.1(a)(1), because the offense level for the underlying offense detailed in Count 1 can be determined, that calculation serves as the base offense level for Count 8. As detailed above, the total adjusted offense level for Count 1 is 38, thus the base offense level for Count 8 is <u>38</u>.

    **g.   Count 8 – Specific Offense Characteristics**

Section 2S1.1(b)(2)(B) of the Sentencing Guidelines requires a 2-level increase in the offense level where the defendant was convicted under 18 U.S.C. § 1956. U.S.S.G § 2S1.1. Mr. Gonzalez-Garcia pled guilty to violating 18 U.S.C. § 1956(h) in Count 8, so his offense level is increased by 2 levels to <u>40</u>.

    **h.   Count 8 – Adjustment for Role in the Offense**

Section 3B1.1 of the Sentencing Guidelines requires a 4-level increase in the offense level if the defendant was "an organizer or leader" in the charged conspiracy, or a 3-level increase if the defendant was "a manager or supervisor (but not an organizer or leader)" in the charged

conspiracy. Both the Government and Ms. Stern incorrectly accuse Mr. Gonzalez-Garcia of holding an "organizer or leader" role in the charged conspiracy. For the reasons state above, this increase does not apply to Mr. Gonzalez-Garcia.

### i. Count 8 – Adjusted Offense Level

When all of the adjustments listed above are considered, Mr. Gonzalez-Garcia's Adjusted Offense Level for Count 8 remains at 40.

### j. Grouping

Section 3D1.2(c) of the Sentencing Guideline instructs the Court to group counts where "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." U.S.S.G. § 3D1.2(c). Mr. Gonzalez-Garcia agrees with Ms. Stern that here, the conspiracy to traffic drugs embodied in Count 1 constitutes a specific offense characteristic of conspiracy to launder money embodied in Count 8. *See* U.S.S.G. § 2S1.1(b). Therefore, Counts 1 and 8 are grouped for purposes of calculating Mr. Gonzalez-Garcia's sentencing guidelines range.

When Counts are grouped together pursuant to U.S.S.G. § 3D1.2(c), "the offense level applicable to a Group is . . . the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). Thus, as detailed above, the offense level applicable to this Group will be 40.

### k. Acceptance of Responsibility

Section 3E1.1 of the Sentencing Guidelines provides relief to a defendant who "clearly demonstrates acceptance of responsibility for his offense" in the form of a 2-level decrease to his guidelines range. U.S.S.G. § 3E1.1(a). As both the Government and Ms. Stern have indicated, Mr. Gonzalez-Garcia has clearly demonstrated that he accepts responsibility for his participation in the charged conspiracy; he has shared his story with the United States Attorney and DEA Agents

on two occasions, and changed his plea to Guilty. The Government indicated satisfaction that Mr. Gonzalez-Garcia was truthful during the proffer sessions regarding his role in the charged conspiracies, clearly demonstrating acceptance of responsibility. (Doc. 87, Ex. 1). A 2-level decrease to his guidelines range is more than appropriate here.

Additionally, when a defendant qualifies for the 2-level decrease described above, he is entitled to an additional 1-level reduction "upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." The Government has signaled an intent to so move this Court and the request for an additional 1-level reduction should be granted.

In total, for Mr. Gonzalez-Garcia's timely acceptance of responsibility, his Guideline Range Calculation should be reduced by 3 levels, to 37.

**l. Group 1 – Counts 1 and 8 – Total Offense Level**

Based on all of the calculations above, the Total Offense Level for Counts 1 and 8 grouped together is **37**.

**m. Guidelines Range**

When a Total Offense Level of 37 is cross-referenced with a Criminal History Category of I, as it should be in this case, Mr. Gonzalez-Garcia is left with a recommended guideline range of 210-262 months of imprisonment.

While the Guideline Range is instructive to the Court, and can be a useful tool, Mr. Gonzalez-Garcia respectfully requests a downward variance from the guideline range to the 10-year mandatory minimum sentence, as described below.

IV.     **SENTENCING FACTORS**

The Supreme Court of the United States has repeatedly held that the primary touchstone of criminal sentencing is the mandatory factors set forth in 18 U.S.C. § 3553(a) – not the advisory Sentencing Guidelines.   *See, e.g., Nelson v. United States*, 555 U.S. 350, 352 (2009)(*per curiam*)("The guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.")(emphases in original).   In fashioning a sentence that comports with the statutory mandates of § 3553(a), the Court "may *not* presume that the Guidelines range is reasonable," but instead "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).  It is the Court's duty to "make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration of) the advice of the Guidelines" if the result suggested does not comport with the sentencing court's view of an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 113 (2007)(Scalia, J., concurring).

The Seventh Circuit has similarly stated that the sentencing court must impose an appropriate sentence under § 3553(a) "without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007).  The court's "choice of sentence, whether inside or outside the guideline range, is discretionary," and the court has substantial "freedom to impose a reasonable sentence" outside the advisory range. *United States v. Demaree*, 133 S. Ct. 2072 (2013).  A sentence below the advisory guideline range is appropriate where the reasons for selecting that sentence "are rooted in [§] 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency." *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

Pursuant to § 3553(a), the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing.]"  18 U.S.C. § 3553(a).  To

11

that end, the court is tasked with considering: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need for the sentence imposed to protect the public from further crimes of the defendant; the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established in the sentencing guidelines; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). After consideration of those factors, as discussed below, it will be clear to the Court that the statutory mandatory minimum sentence of 10 years is sufficient in this case, and any sentence beyond that would be greater than necessary to meet the purpose of sentencing.

### a. The History and Characteristics of Mr. Gonzalez-Garcia

It is important for the Court to consider the history and characteristics of Mr. Gonzalez-Garcia as a person in fashioning an appropriate sentence. 18 U.S.C. § 3553(a). Mr. Gonzalez-Garcia's personal history and characteristics paint the picture not of the drug traffickers portrayed in movies, nor the narcotraficantes portrayed in the corridos he heard growing up. Instead, it is clear that he is a family man with strong ties to his community and an insatiable need to help others. He understands that all of the good he has done in his life does not make up for the bad he has done, and all the pain and suffering he has experienced is not an excuse to cause pain and suffering to others; he accepts the fact that he must be punished for his actions. He humbly asks

12

that this Court judge him not only for the worst parts of his past, but also for the overwhelmingly positive effects he has had on those in his community and his family; he asks for this Court's mercy in sentencing.

Although he was born in Monterrey, Mexico, Mr. Gonzalez-Garcia has spent most of his life living in a small town outside of Monterrey called Cerralvo. The son of loving parents, he, his twin sister Imelda, and their older brother Gerardo were loved deeply and well taken care of. Together, they formed a tight-knit family. Their parents worked hard to teach all three of their children the importance of hard work, involvement in the community, and charitable giving. They were not wealthy, but they always had everything they needed, and always made it a point to help others in need. The biggest gift Mr. Gonzalez-Garcia received from his parents is his innate desire to help those around him.

Mr. Gonzalez-Garcia's father owned and operated various businesses throughout his life. He inherited a large plot of land in Cerralvo that he used as a ranch, he had a chicken farm from which he sold eggs, he had a produce transportation company that shipped corn products between Mexico and Texas, he spent time as a carpenter, and he ran a taco stand. In the midst of all of his hard work, he never lost sight of what was important and always found time to help others. Whether it was his work as president of the local branch of the Red Cross, or simply helping members of his community find work, Mr. Gonzalez-Garcia's father always found a way to help those in need. Similarly, while his mother started as a homemaker raising Mr. Gonzalez-Garcia and his siblings, she was elected as the first female mayor of Ciudad Cerralvo at the young age of 30. When her term as mayor was over, she opened her own interior decoration business in Monterrey. Throughout the years, she supported an organization called Destellos de Luz, which helps those with visual disabilities.

His parents' penchant for both hard work and charitable giving left an indelible impression on Mr. Gonzalez-Garcia. From a young age, Mr. Gonzalez-Garcia saw himself as more valuable to his family as a worker than a student, and dropped out of high school at about 16 or 17 years old to help his father and brother run their corn transportation business. Throughout his life, he has worked in a variety of jobs, often struggling to make ends meet, in an effort to give his family the life he thought they deserved. Where he found financial success, he never lost sight of the lessons of giving back to his community that he learned from his parents. For years, Mr. Gonzalez-Garcia has donated hundreds of toys to impoverished children in Cerralvo, he has persisted in his mother's legacy of supporting Destellos de Luz, and he has offered his ranch to an organization that uses the horses to treat and work with local children on the autism spectrum. He coordinated a family effort to assist his single elderly aunt fix up her house to make it a place for her family to gather. And upon learning of a local man's calling to the priesthood, Mr. Gonzalez-Garcia supported him financially through the seminary so that he could fulfill his dream.

While working at his father's business, Mr. Gonzalez-Garcia met his first wife, Leticia. They quickly fell in love and got married, giving birth to Mr. Gonzalez-Garcia's first son Edgar. In an effort to make a life for himself, Mr. Gonzalez-Garcia opened his own restaurant. For about five years, he tried to make the restaurant a success, but could not get it off the ground. So, he packed up his family and moved to McAllen, Texas, in search of a better life and the "American dream." It was during this time that Mr. Gonzalez-Garcia began buying cars in the United States to sell in Mexico. He was struggling to make a living as a legitimate businessman with a new child to care for, but the family was making ends meet.

In 1995, Mr. Gonzalez-Garcia's world was turned upside down with the news that his father had committed suicide. His father's death left a large void in the family structure, and he

could feel it start to splinter. Feeling a deep sense of sadness and guilt for being absent when his father committed suicide, Mr. Gonzalez-Garcia never got over the feeling that if he were in Cerralvo he could have done something to help. He immediately took on the responsibility of caring for, providing for, and protecting his mother and his siblings.

Feeling the financial crunch of caring for not only his wife and child, but his extended family as well, Mr. Gonzalez-Garcia continued to find ways to make money. While buying and selling vehicles in Chicago, he was introduced to people working in the produce industry. He was able to get a job selling produce to restaurants throughout Chicago. Unfortunately, it was also his introduction to the drug trade – while he was not buying or selling drugs at that time, Mr. Gonzalez-Garcia would buy produce at a discount that had been used as a "cover load" for trafficking marijuana. He would then sell the produce at normal prices to make a higher profit margin.

In 2010, Mr. Gonzalez-Garcia's life was again turned upside down with his mother's cancer diagnosis. He immediately moved back to Cerralvo, where he spent nearly every day by his mother's side. For five months, he watched as his beloved mother passed away. He suffered greatly at her loss; she was often the person to whom he would look for strength. When his mother passed away, Mr. Gonzalez-Garcia's personal life began to unravel. He and his wife Leticia separated and eventually divorced.

After his divorce, Mr. Gonzalez-Garcia sought out a change of pace and a change of scenery. He learned about a government program aimed toward supporting local agricultural entrepreneurs, and thought it would be a perfect use of his family's ranch. So, Mr. Gonzalez-Garcia moved to Puebla, Mexico, to dedicate himself to learning the business of growing tomatoes in greenhouses. It was during his time in Puebla that Mr. Gonzalez-Garcia was invited into the drug trafficking business. He was approached by a co-conspirator who wanted his expertise in

bringing product across the border. Clouded in bad judgment, Mr. Gonzalez-Garcia started to supplement his income with the quick cash of trafficking cocaine – a decision he will forever regret, and a decision for which he is deeply remorseful.

It was also during this time that Mr. Gonzalez-Garcia was introduced to his wife Claudia. For months, they maintained a long-distance relationship – Claudia in Monterrey and Mr. Gonzalez-Garcia in Puebla – before agreeing to move in together in Puebla. In 2015, they agreed that they could not continue to live so far from their families in Monterrey, so they packed all of their belongings and moved back home. There, they were blessed with the first of their two sons – Mr. Gonzalez-Garcia's namesake, Luis Eduardo. Putting a pause on his dream of running a farm, Mr. Gonzalez-Garcia started a general contracting/commercial construction and design company to support his family. When the contracting business got off the ground, he began to turn his attention toward converting the family ranch into a sustainable ecotourism site building off his work in Puebla.

On May 4, 2016, Mr. Gonzalez-Garcia suffered a spinal injury that required significant surgery on 2 of his lower vertebrae and temporarily derailed his plans for the ranch. The injury left him mostly immobile until July of that year when he and his entire family – 16 of his brothers, sisters, nieces, nephews, aunts, uncles, wife, and child took a planned vacation to Europe. When they returned, he got married to Claudia who shortly thereafter gave birth to their second son. For most of the next year, Mr. Gonzalez-Garcia was in and out of surgeries, so he dedicated most of that time to his young family and his health. As his health improved in late 2017, he resurrected the ecotourism project at his ranch and began to make real strides toward its fruition. He secured permits, drafted plans, and designed projects.

In May of 2018, while travelling to El Salvador to purchase calves at auction for the ranch, Mr. Gonzalez-Garcia was stopped in the airport in Guatemala City by several DEA Agents and brought to Chicago to face the charges against him in this case. He could have tried to escape or put up roadblocks to his extradition, but instead he voluntarily boarded an airplane to the United States and surrendered to the custody of the American Government. It has been over four years since Mr. Gonzalez-Garcia was able to hold either of his sons or his new bride. Locked away in a foreign country and surrounded by strangers, Mr. Gonzalez-Garcia continues to wait patiently for the day they can reunite.

As Your Honor will read in the letters submitted by Mr. Gonzalez-Garcia's community and family, he is often a beacon of light for those around him. *See* Letters of Support, attached hereto as **Group Exhibit 1**.[2] He is a glue of sorts for his large extended family, known amongst his cousins, aunts, and uncles as the family member that keeps in touch with everyone. He maintains a very healthy and positive relationship with his ex-wife, and has maintained a very close relationship with his children even during his time of incarceration. He is generous, gracious, and affable, which has allowed him to build strong bonds with many people throughout his home region of Cerralvo. His community feels the pain of his absence, while it deals with the shock of his arrest. They eagerly await his return, and look forward to everything his ranch's ecotourism project will bring to the community. His two young sons deeply miss their father, and the pain of knowing that he will not be there for many of their formative years brings endless pain and sorrow to Mr. Gonzalez-Garcia's heart.

Mr. Gonzalez-Garcia is endlessly remorseful for perpetuating the scourge of the drug trade through Monterrey and into the United States. He regrets the choices he has made, and knows that

---

[2] The letters of support in **Group Exhibit 1** were written in the Spanish language. Included with those letters for the Court's reference are translations from Spanish to English.

the fault lies with nobody but himself. He is deeply saddened to know that the decisions he made have taken him from his young boys, his grown son, his wife, and his family, and is burdened knowing that he has brought disgrace to the family name his mother and father worked so hard to build up. He is heartened by the support he receives from his family and from members of his community, and looks forward to the day he can be reunited with them. He plans to finish the ecotourism project he began almost a decade ago, and humbly asks this Court for a sentence that does not delay that reunion for too much longer.

Mr. Gonzalez-Garcia asks this Court for the mandatory minimum sentence of ten years, with five years of supervised release.

### b. The Nature and Circumstances of the Offense

The Court must also consider the nature and circumstances of the offenses with which Mr. Gonzalez-Garcia has pled guilty when determining a sentence that is sufficient but not greater than necessary. 18 U.S.C. § 3553(a). Mr. Gonzalez-Garcia understands that his conduct in this case has not only hurt himself and his family, but has destroyed his business relationships and caused deep embarrassment in those that love him the most. While he is proud of the way he has lived a majority of his life, he is painfully aware of the fact that his actions in this case have caused irreparable harm to his reputation and starkly overshadow all of the good things he has accomplished. Although he has spent much more of his life in pursuit of honorable goals, the handful of years he spent trafficking cocaine will forever overshadow those times.

Mr. Gonzalez-Garcia was involved in the international trafficking of cocaine from Central America to the United States. While it was not his money, his drugs, or his operation, Mr. Gonzalez-Garcia understands that his role in the drug trafficking organization allowed for it to exist. Mr. Gonzalez-Garcia was invited into the cocaine smuggling business because of the

18

experience he had crossing the border from Monterrey, Mexico, into McAllen, Texas. In legitimate business ventures including the buying and selling of automobiles, the shipment of eggs from his father's aviary to Texas, and his transportation of American food products to Mexico for his restaurant, Mr. Gonzalez-Garcia developed an expertise that was attractive to people trying to move cocaine through those same channels.

Mr. Gonzalez-Garcia gave into the allure of easy money and lent his expertise to those traffickers. Together with his co-conspirators, they developed a network that shipped cocaine from Central America to Mexico City. Mr. Gonzalez-Garcia arranged for those shipments to be transported from Mexico City to Monterrey, where he prepared them to cross the border. A network of truck drivers took those drugs from Monterrey to McAllen, where other co-conspirators had developed a network of warehouses to store the drugs. From McAllen, the drugs were driven and flown throughout the United States by a co-conspirator pilot, who had a network of local distributors in Atlanta, Chicago, and Texas. The cash proceeds from that distribution would work their way back to the McAllen area through the same network, where Mr. Gonzalez-Garcia would arrange to have truck drivers bring the cash back over the border and down to Mexico City, where it would be taken to the distributors.

Unlike many of the drug trafficking operations working throughout Mexico, the organization Mr. Gonzalez-Garcia was involved with did not resort to violence. In fact, when it seemed as though a co-conspirator might resort to the violence that is so often connected to his trade, Mr. Gonzalez-Garcia would use his strong interpersonal relationships and affable personality to calm tensions and buy his associates another chance.

It was never his goal to live a life of crime, but the personal pressures of providing for several family members and continuing his parents' legacy of charity left Mr. Gonzalez-Garcia

desperate to make money. In a dearth of support left from the passing of his mother, Mr. Gonzalez-Garcia chose the easy way out, and regrets that decision every day of his life. Mr. Gonzalez-Garcia understands that while he was never face-to-face with the victims of his crimes, the effects are wide-reaching. He regrets any contribution he has made to the disintegration of anyone's family or the financial hardship of anyone's life. His decision to participate in the drug trade was a highly regrettable chapter in his otherwise laudable life, and he suffers at the prospect of harm he has brought to others. While it was a small chapter in his life, Mr. Gonzalez-Garcia understands that his participation in this conspiracy has an outsized effect on the rest of his life. It is with that understanding, and through the lens that he is a peaceful, charitable, and loving man, that he humbly asks this Honorable Court for a downward departure from the sentencing guidelines in this case.

### c.  Deterrence from future criminal activity and the need to protect the public from further crimes

An important factor for the Court to consider in fashioning a sentence that is sufficient, but not greater than necessary to meet the goals of the sentencing statute is the need for deterrence from future criminal activity and the need to protect the public from further crimes. 18 U.S.C. § 3553(a). Mr. Gonzalez-Garcia does not pose a risk of recidivism, and the mandatory minimum sentence of ten years in custody will be sufficient to assure he never commits another crime for the rest of his days.

Mr. Gonzalez-Garcia is 65 years old, and together with his wife Claudia, they have two boys under the age of 10 years old. For more than four years, Mr. Gonzalez-Garcia has been without the embrace of his wife or the touch of his children. He has missed out on birthdays, holidays, school milestones, sports accomplishments, and religious sacraments. He maintains a solid relationship with his wife and young children, but it is limited by the connections that can be

formed through the telephones at the MCC. Similarly, his inability to provide counsel or be physically present as his adult son grows into a spectacular young man weighs heavily upon him. These facts alone have been enough to deter Mr. Gonzalez-Garcia from ever committing another crime for the rest of his life.

Beyond his wife, his young sons, and his adult son, Mr. Gonzalez-Garcia was driven by the connections he made with his extended family and the people of his hometown of Cerralvo. Eager to earn back their respect, he wants nothing more than to live out the rest of his days working the land that he inherited from his father, who inherited it from his father. His goals of building an ecotourism project on his ranch has never died. He hopes to be able to make that dream come to fruition so that he can leave a legacy for his sons to carry on when his life ends. As Your Honor will read in the letters of support from Mr. Gonzalez-Garcia's community, **Group Exhibit 1**, they are ready to welcome him home, and will work to make sure he is never taken from them again.

Mr. Gonzalez-Garcia realizes that he is luckier than most of the men with whom he is housed in that he has a loving and supportive family and community eagerly awaiting his return. He will be able to rely on the charity of his brother and sister, aunts, uncles, and cousins, and community members that have benefitted from his charity in the past. They will be certain to keep him on a righteous and law-abiding path. While many of the defendants that come before this Court for sentencing pose a great risk to the safety of the community and are almost certain to re-offend, Mr. Gonzalez-Garcia will benefit from the support and love of his family and his community upon his release. With that in mind, he humbly asks this Honorable Court to sentence him to the mandatory minimum sentence of ten years in prison, with five years of supervised release upon his exit from custody.

**d. The need to avoid unwarranted sentence disparities among defendant with similar records who have been found guilty of similar conduct.**

Finally, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing, this Court must consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a). A sentence anywhere near the calculated guideline range, when compared to the sentences received by Mr. Gonzalez-Garcia's co-defendants, would be much greater than necessary and would result in a very large unwarranted sentence disparity.

The conspiracy of which Mr. Gonzalez-Garcia was a part resulted in the indictment of at least nine co-conspirators, most of whom have pled guilty to the same conduct as Mr. Gonzalez-Garcia and assessed a sentence well below the guideline range in this case and in their cases. Specifically:

- Martin Villegas-Navarrete was the "ringleader" of the criminal conspiracy in which Mr. Gonzalez-Garcia was involved. His connections to drug traffickers throughout Central and North America, his involvement in other drug trafficking networks, and his access to cash made this criminal conspiracy work. In 2011, he was indicted by the Northern District of Georgia in a three-count indictment alleging Conspiracy to Possess with Intent to Distribute large quantities of cocaine, and money laundering. That conspiracy was wholly unrelated to the conspiracy he led in this case. Following a plea of guilty in that case, and several proffer sessions with DEA agents across the country, Mr. Villegas-Navarrete was sentenced to **165 months** and 5 years of supervised release. Unlike Mr. Gonzalez-Garcia, Mr. Villegas-Navarrete has made a life out of trafficking drugs, terrorizing communities,

22

and committing crime. He even has the dubious distinction of having at least one corrido written about him; his terror is legendary throughout Mexico.

- Agustin Patricio was recruited into the conspiracy by his Godfather, who was one of the forming members of the conspiracy. He was indicted under case number 16-CR-515 in the Northern District of Illinois with three counts of possession and distribution of cocaine following a raid of a warehouse he maintained in Arlington Heights. On April 14, 2022, he was sentenced to **67 months** in prison, with 2 years of supervised release.

- Jesus Arredondo-Alvarez was recruited by Agustin Patricio to run operations on the Texas side of the border. Using a network that he built through years of participation in the drug trade, Mr. Arredondo-Alvarez rented warehouses along the border that the conspiracy used to hold drugs and money while awaiting shipment to its final destination. He was the liaison between the Mexico side of the operation and the United States side of the operation. He was indicted under case number 17-CR-316-1 in the Northern District of Illinois with essentially the same charges as Mr. Gonzalez-Garcia. He ultimately pled guilty to one count of conspiracy to distribute cocaine and one count of conspiracy to launder drug proceeds, much like the defendant in this case, and his guideline range was calculated to be 292 to 365 months. Despite his attempts to use Mr. Gonzalez-Garcia as a scapegoat and minimize his own role in the conspiracy, Mr. Arredondo-Alvarez was sentenced on April 6, 2022 to a term of **132 months** in prison and 5 years of supervised release. Mr. Gonzalez-Garcia certainly did not have a greater role in this conspiracy than Mr. Arredondo-Alvarez, and he has proven himself to be a much more reliable narrator of events than Mr. Arredondo-Alvarez. In the interests of justice, he should not be sentenced to a greater term of imprisonment than Mr. Arredondo-Alvarez.

- Luis Garcia was directed by Jesus Arredondo-Alvarez and Augustin Patricio to operate warehouses throughout Chicagoland to hold shipments of cocaine until they could be distributed, and cocaine proceeds until they could be shipped back down to Texas. He was indicted under case number 17-CR-316-2 in the Northern District of Illinois with essentially the same charges as Mr. Gonzalez-Garcia. He ultimately pled guilty to one count of conspiracy to distribute cocaine and one count of conspiracy to launder drug proceeds, much like the defendant in this case, and his guideline range was calculated to be 292 to 365 months. On May 26, 2022, Mr. Garcia was sentenced to **126 months** of incarceration with 5 years of supervised release.

- Noemi Rosales-Sanchez was responsible for opening warehouses in Texas, Georgia, and Illinois, that were designed to hold narcotics and cash proceeds as part of this conspiracy. She was indicted under case number 17-CR-316-3 in the Northern District of Illinois with essentially the same charges as Mr. Gonzalez-Garcia. She ultimately pled guilty to one count of conspiracy to distribute cocaine and one count of conspiracy to launder drug proceeds, much like the defendant in this case, and her guideline range was calculated to be 360 months to life. On April 13, 2022, Ms. Rosales-Sanchez was sentenced to **120 months** of incarceration with 5 years of supervised release.

- Jose Delrio was a local Chicago distributor of product received from the defendant's co-conspirators. He was indicted in case number 16-CR-771-1 in the Northern District of Illinois with three counts related to the distribution of cocaine. On May 16, 2018, he was sentenced to **96 months** with a 3-year period of supervised release.

There are other co-conspirators of Mr. Gonzalez-Garcia that either evaded capture or are awaiting sentencing. While each member of the conspiracy played a different role during its

24

existence, the conspiracy could not have existed without each member. Some members of the conspiracy played large roles in its creation and its continued operation, including Martin Villegas-Navarrete, Jesus Arredondo-Alvarez, and Agustin Patricio. Mr. Gonzalez-Garcia did not play a bigger role than any other member, and played a smaller role than both Villegas-Navarrete and Arredondo-Alvarez. Many of the co-conspirators that were already sentenced received the benefit of a 5K1.1 recommendation that came after they cooperated with the government – a benefit that Mr. Gonzalez-Garcia can not reap because of when he was arrested. He nevertheless risked his life to share his story with the Government on two different occasions – sessions that the Government agrees to have been honest and fruitful. His story, unfortunately, was a story already told and he was unable to receive the increased sentencing benefit that others enjoyed.

Nevertheless, the sentences in this case, regardless of culpability, are consistently near the mandatory minimum of 10 years (120 months). Justice and fairness dictate that Mr. Gonzalez-Garcia receive a sentence commensurate with those of his co-conspirators in this case, and certainly no greater than that of Jesus Arredondo-Alvarez.

## V. <u>CONCLUSION</u>

Mr. Gonzalez-Garcia takes full responsibility for his actions. Nobody forced him to join the drug trade, and he came from a family situation that taught him better than living a life of crime. He will forever regret his decisions as he watches his two young sons grow up from behind the bars of a foreign prison. Mr. Gonzalez-Garcia has spent his life spreading joy to those around him, building friendships with his community, and giving every ounce of his soul back to his neighbors. Certainly, he will always be remembered for the mistakes he has made, but those mistakes do not define him. He is a kind, funny, compassionate man that fell to the pressures of providing for his family. He knows that he has to pay for his crimes, he only asks this Court to

show mercy in sentencing him. If this Court can sentence him to a period of incarceration at or near the mandatory minimum of 10 years, he will be able to rejoin the community that he spent most of his life making better, and be greeted by a support structure that will keep him out of trouble moving forward.

**WHEREFORE**, Luis Eduardo Gonzalez-Garcia respectfully asks this Court to issue the only sentence that is sufficient, but not greater than necessary in this case: 10 years imprisonment on both Counts, to run concurrently, with 5 years of supervised release.

Respectfully submitted,

*/s/ Richard M. Beuke*
Richard M. Beuke
Attorney for the Defendant, Luis Eduardo Gonzalez-Garcia

*/s/ Timothy M. Black*
Timothy M. Black
Attorney for the Defendant, Luis Eduardo Gonzalez-Garcia

**RICHARD M. BEUKE**
801 N. Cass Avenue, Suite 200
Westmont, Illinois 60559
(312) 427-3050 – phone
(312) 427-1215 – fax

**TIMOTHY M. BLACK**
416 Higgins Road, Suite B
Park Ridge, Illinois 60068
(847) 696-7185 – phone
(847) 696-7182 – fax

26

## CERTIFICATE OF SERVICE

I, Timothy M. Black, Attorney at Law, hereby certify that Defendant's Sentencing Memorandum and Objections to the PSR was served on November 13, 2022, in accordance with Federal Rule of Criminal Procedure 49, Federal Rule of Civil Procedure 5, and Local Rule 5-1 pursuant to the District Court's system for ECF filers.

*/s/ Timothy M. Black*
Timothy M. Black
416 Higgins Road, Suite B
Park Ridge, Illinois  60068
(847) 696-7185 – phone
(847) 696-7182 – fax