UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 17 CR 544-1 |
| v. | ) | |
| | ) | Hon. Ronald A. Guzman |
| LUIS EDUARDO GONZALEZ GARCIA | ) | |
| | ) | <u>UNDER SEAL</u> |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>[1]

The United States of America, by and through its attorney, JOHN R. LAUSCH,
JR., United States Attorney for the Northern District of Illinois, hereby respectfully
submits the Government's Sentencing Memorandum, and asks this Court to sentence
the defendant to no less than 400 months' imprisonment, a fine of at least $1,500,000,
and a 5-year period of supervised release.

## I.      Background

For over five years, defendant sat at the top of a vast international cocaine
distribution network. Defendant partnered with high-ranking members of Mexican
drug cartels, including Martin Villegas of the Beltran-Leyva Cartel, to purchase and
transport thousands of kilograms of cocaine from Mexico City to the Mexico/Texas
border. From there, defendant and his operatives were responsible for smuggling the
cocaine into the United States and distributing it across the country through a

---

[1] Attached to this sentencing memorandum as Exhibit A is a redacted proffer interview report
of Martin Villegas-Navarette, a former high-level member of the Beltran Leyva Cartel with
whom defendant partnered to traffic large quantities of cocaine. The government has
previously provided an unredacted copy of this report to defendant in discovery.

sophisticated network of warehouses and front companies that posed as legitimate distributors of various dry goods (including furniture and Mexican snack food and laundry detergent).

During the conspiracy, defendant directed and oversaw the establishment and operation of over ten cocaine distribution warehouses in the United States, including in Chicago, Naperville, Arlington Heights, and Plainfield, Illinois; McAllen, Laredo, Houston, and Dallas, Texas; Atlanta, Georgia; and elsewhere. Defendant also directed and supervised the recruitment and training of multiple individuals within the United States—including Timothy Stalka, Jesus Arredondo Alvarez, Luis Garcia, Noemi Rosales Sanchez, and Augustin Patricio—to operate the warehouses, distribute the cocaine, and launder the proceeds on defendant and his Cartel partners' behalf.

At defendant's direction, the warehouse operatives set up sophisticated front companies to conceal the drug trafficking activity occurring at the warehouses. The front companies were registered with Secretaries of State as legitimate businesses, and often had their own websites, uniforms, logos, and vehicles to further the front. In that way, defendant was able to conceal for several years the distribution of staggering quantities of narcotics and drug proceeds occurring largely in plain view in major urban and suburban areas.

Between 2012 and 2017, thousands of kilograms of cocaine and tens of millions of dollars in narcotics proceeds flowed through defendant's DTO warehouses. The drugs and money were primarily transported in concealed semi-truck shipments

(usually driven by unwitting drivers), in which a "dirty" pallet containing large quantities of cocaine (typically 50 to 100 kilograms per shipment) or drug proceeds (typically $500,000 to $1.5 million per shipment) was hidden within several other pallets containing the types of dry goods that the front companies purported to sell.

As described in detail in the Government's Version, at several points during the conspiracy, law enforcement seized large quantities of cocaine and drug proceeds from defendant's operatives. G.V., pp. 3-8. Rather than turn away from drug trafficking after these seizures, each time defendant doubled down by shutting down all existing DTO warehouses in the United States and reshuffling operations by recruiting new DTO operatives and setting up new DTO warehouses and front companies.

Working for defendant was a dangerous business. Although the government does not have evidence that defendant ever used violence in furtherance of drug trafficking, he was certainly willing to. As set out in the Government's Version, after law enforcement seized 100 kilograms of cocaine from one of defendant's Atlanta warehouses in 2015, defendant openly discussed with one of his lieutenants having the leader of the warehouse murdered in Mexico to prevent him from cooperating with law enforcement. See G.V., 7-9 ("They should not snitch, if not, I'll get rid of him here dude"; "And what if he rats on you and it becomes a problem[?] If you want . . . I can take him out over there [Mexico]"; "The company [Cartel] doesn't tolerate bullshit [cooperating with law enforcement].").

3

Defendant is responsible for the distribution of thousands of kilograms of cocaine throughout the United States, and the laundering of well over $50,000,000 in narcotics proceeds.

## II. The Government's Position on Sentencing

The district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the § 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). The sentence imposed must be "sufficient, but not greater than necessary," to comply with the purposes of sentencing provided under 18 U.S.C. § 3553(a)(2).

### A. The PSR

The government has no factual objections to the PSR and agrees with the Probation Officer's guidelines calculation (though it is questionable whether defendant should receive acceptance of responsibility credit given his frivolous objections to certain sentencing enhancements). Defendant is a total offense level of 43 and a criminal history category of I, leading to an advisory range of life imprisonment.

The Government's Version and accompanying exhibits provide a detailed explanation and evidentiary basis for each of the sentencing enhancements that the Probation Officer correctly applied. Defendant's objections to the various enhancements are frivolous—he blithely dismisses the consistent and independently corroborated sworn testimony of five cooperating witnesses as "lies" without

4

providing any evidence to support his version of events. R. 98, 3. There is good reason for that: defendant's version is fiction.

## B.    The 3553(a) Factors

### 1.   Nature and Circumstances of the Offense

Defendant is responsible for putting ton quantities of cocaine on city streets across America, the human toll of which is incalculable. At sentencing, the Court will not hear from the likely thousands of addicts who ingested defendant's poison, or their family members and friends who suffer quietly as they watch their loved ones suffer under the grip of drug addiction. Nor will the Court hear from the community members who have endured the violence and general social decay that accompanies the drug trade, from the violence and corruption in Mexico down to the gang violence on the streets of Chicago and across this country.  But the victims are out there, and they should be forefront in the Court's mind when fashioning an appropriate sentence.

Defendant's willingness to use violence in furtherance of his drug trafficking operation is also severely aggravating. Further, even if not directly involved, anyone who participates at the highest levels of drug distribution bears meaningful responsibility for the horrific violence that inevitably accompanies the drug trade at various points throughout the distribution chain.

Defendant's money laundering activity also calls for the severest of penalties. By successfully laundering tens of millions of drug proceeds back down to himself and his Cartel partners in Mexico, defendant not only undoubtedly enriched himself but

also enriched the Mexican drug cartels—some of the most dangerous criminal organizations in the world. This, in turn, allowed the Cartels to deepen and extend the reach of their pernicious trade across Mexico, the United States, and elsewhere.

2. History and Characteristics

Defendant's lack of prior criminal history is significant, but it is largely offset by the fact that he operated at very high levels of international drug trafficking for years before getting caught. There is nothing in defendant's background the provides meaningful mitigation or context to his crimes. He grew up in a stable, two parent household in Mexico. He never wanted for necessities or suffered any form of abuse. Defendant completed high school and appeared to have had the ability and family support to do what he wanted from there.

In other words, defendant had the type of stable upbringing and positive opportunities in life that many, if not most, defendants who appear before this Court do not, yet he still chose to engage in drug trafficking. This underscores not only the pure greed that motivated him, but also his shocking disregard for the ravaging human consequences of the drug trade.

Moreover, defendant's sentencing papers and his refusal to cooperate with the Probation Department's financial investigation demonstrate a stunning lack of remorse and acceptance of responsibility. PSR, ¶¶ 72-73. Defendant seeks to portray himself as a misunderstood cattle farmer of modest means rather than the prolific international drug trafficker that he truly is. As discussed in detail below, contrary to his representations to the Probation Department, defendant is a very wealthy man,

which is unsurprising given his years-long involvement in distributing enormous quantities of cocaine.

On the mitigating side of the ledger, in late 2021, defendant participated in two proffer sessions with the U.S. Attorney's Office. The government believes that defendant provided mostly truthful information during the proffer, except that he minimized his role in the offense and was not forthcoming with information regarding his finances (much like his position at sentencing). Although the information was no longer useful to the government at the late stage at which defendant decided to proffer, it is the government's position that he should receive some credit in mitigation for proffering.

3. 3353(a)(2) Factors

The severest of penalties is required in this case to properly vindicate the 3553(a)(2) factors. Defendant's conduct represents a stunning disregard for human life and respect for American laws. The need to punish and promote respect for the law is therefore at an apex. General deterrence is also highly significant in this case. Wholesale drug distribution networks such as defendant's serve as an essential bridge between the Mexican drug cartels and the street-level dealers who sell to the ultimate consumers. Knocking out that wholesale supplier bridge represents law enforcement's best chance at meaningfully disrupting the global narcotics trade, as there are relatively few such organizations (compared to the number of street-level distributors) and they are easier for U.S. law enforcement to reach than Cartel leaders in Mexico. Anyone who is considering partnering with the cartels to move

their products from Mexico to the streets of this country must know that they will face the severest of consequences. With this sentencing, the Court has a meaningful opportunity to broadcast that message.

There is also a need to individually deter and punish defendant. Defendant has no verifiable employment in his history (PSR, ¶ 68)—in other words, drug trafficking is the only way he knows how to make a living. If he is released and deported to Mexico while he is still of working age, he would face a strong incentive to return to drug trafficking to make up for the financial losses he has suffered due to this case. That cannot be allowed to happen.

4. <u>3553(a)(6): Need to avoid unwarranted sentencing disparities</u>

Several of defendant's co-conspirators who were charged in different indictments have been sentenced, including the following:

- Jesus Arredondo Alvarez, sentenced to 132 months' imprisonment by Judge Feinerman on April 6, 2022 by Judge Feinerman (17 CR 316-1);

- Luis Garcia, sentenced to 126 months' imprisonment by Judge Feinerman on May 26, 2022 (17 CR 316-2);

- Noemi Rosales Sanchez, sentenced to 120 months' imprisonment by Judge Feinerman on April 13, 2022 (17 CR 316-3);

- Augustin Patricio, sentenced to 67 months' imprisonment by Judge Wood on April 14, 2022 (16 CR 515).

None of the previously sentenced co-conspirators were similarly situated to defendant and therefore there is no risk of unwarranted disparity if the Court sentences defendant to a substantially longer term of imprisonment, as recommended by the government and probation. First, unlike defendant, each of the above

defendants provided substantial cooperation to the government and earned 5K1.1 recommendations of at leas 50% off the low end of the guideline range.

Second, each of the above defendants was subordinate to defendant, who was the leader of his drug trafficking organization. Arredondo Alvarez oversaw defendant's U.S-based DTO warehouse operations from approximately 2013 to 2015. Luis Garcia served as the DTO's chief financial officer for several months in 2015 to 2016, and effectively operated the DTO for a few months in 2016 while defendant was traveling overseas. Otherwise, Garcia's involvement was mostly limited to managing one of the DTO's warehouses in Arlington Heights. Noemi-Rosales Sanchez assisted with establishing several new DTO warehouses in 2016 and ran day-to-day operations at a DTO warehouse in Houston for approximately two months. Augustin Patricio was a worker at the DTO's Arlington Heights warehouse.

Third, defendant is responsible for a far larger quantity of narcotics than any of his previously sentenced co-conspirators. Defendant led the DTO for roughly 5 years and is directly responsible for all the narcotics moved by the DTO throughout that time. The previously sentenced defendants' involvement in the conspiracy ranged from just over two months (Noemi Rosales Sanchez) to roughly three years (Arredondo Alvarez).

Finally, none of the previously sentenced co-conspirators had any involvement in the DTO's operations in Mexico or smuggling the drugs into the United States. Defendant, however, partnered with high-level Cartel leaders to purchase huge quantities of cocaine in and around Mexico City, transport the cocaine to the

9

Mexico/Texas border, and then smuggle the narcotics into the United States. The scope of defendant's involvement was therefore much broader, and he presumably earned a much larger share of the profits than his subordinate employees.

### C.     The Court Should Impose a Fine of at least $1,500,000

As detailed in the PSR, defendant has refused to cooperate with the Probation Department's financial investigation. Defendant is obviously trying to conceal from the Court the millions of dollars he earned through his years-long involvement in international cocaine trafficking. The evidence establishes that during the conspiracy well over $50,000,000 was remitted to defendant and his Cartel partners through defendant's U.S. based warehouses. Indeed, cooperator testimony (which is corroborated by substantial independent evidence, including seizures) establishes that at least approximately $56,000,000 was sent from three warehouses alone:

- During the operation of the Naperville DTO Warehouse (2013 to early 2015), Stalka sent an average of 2-3 money shipments down to Mexico per month, each containing between $500,000 and $1.5 million. See G.V. Combined Exhibits A B, pp. 82, 84. A conservative estimate of the total drug proceeds shipped from the Naperville warehouse is therefore 2 shipments of $1,000,000 for 16 months = $32,000,000.

- During Stalka's operation of the Atlanta DTO warehouse (March 2014 to late 2014 or early 2015), he sent out regular money shipments in the same manner as the Naperville warehouse. *Id*. at 10. A conservative estimate of drug proceeds shipped from the Atlanta DTO warehouse during this time is therefore 2 shipments of $1,000,000 for 6 months = $12,000,000 (the Atlanta warehouse continued to operate for several months after Stalka turned over day-to-day operations to another operative).

- During the operation of the Hazardz Inc. warehouse in Arlington Heights (June 2015 to August 2016), the warehouse shipped at least one southbound shipment of narcotics proceeds containing between $800,000 and $1.2 million every month. See G.V. Combined Exhibits A

B, 12. A conservative estimate would therefore be $12,000,000 from this warehouse.

$56,000,000, however, is likely just a fraction of the proceeds funneled through defendant's DTO warehouses, as this figure does not include any of the earnings from multiple other known DTO warehouses in Chicago, Plainfield, Houston, and Dallas.

Based on the evidence and common sense, it is reasonable to assume that defendant kept *at least* 3 percent of all the money flowing back down to Mexico (50,000,000 x .03 = 1.5 million). Indeed, Martin Villegas, one of defendant's Cartel-member partners, paid defendant six percent for every money load that defendant transported, and defendant transported approximately $10,000,000 for Villegas alone (from which defendant would have earned $600,000). *See* Exhibit A, ¶7. Villegas also stated that for drug shipments, Villegas paid defendant in cocaine. Specifically, for every 50 kilograms Villegas shipped through defendant's distribution network, Villegas gave defendant 15 kilograms of cocaine to sell for himself. *Ibid*. Further, defendant charged Villegas $1,500 for every kilogram of cocaine smuggled that did not belong to defendant. *Ibid*. Villegas stated that he shipped at least 130 kilograms of cocaine to the United States through defendant's distribution network, which would have netted defendant an additional approximately $195,000 for smuggling fees alone, and substantially more for the cocaine that Villegas gave to defendant to sell. *Id*, ¶ 2.

Because defendant's wealth is in Mexico, it is difficult to determine a reliable estimate of his total net worth. However, the government's investigation uncovered substantial evidence that he is a very wealthy man. For example,

11

- Multiple cooperators have told the government that defendant owns real estate in several different locations across Mexico, including two homes in Monterrey, a ranch in Centro De Cerralvo, and an apartment in Cancun. Arredondo Alvarez identified photographs of the ranch in his grand jury testimony. *See, e.g.*, Exhibit A, ¶ 9; G.V. Combined Exhibits A B, pp. 15, 27-30.

- Martin Villegas (defendant's Beltran-Leyva Cartel partner) told the government that in 2013, he sold defendant a luxury yacht called the "Tourbillon" for $400,000. See Ex. A, ¶ 3. Multiple pictures of the yacht were recovered on defendant's phone (see below), and several cooperating witnesses identified the yacht as belonging to defendant. In or around May 2019, the yacht was listed for resale on the website www.nautikosyachtbrokerage.com at a price of $450,000.

- In March 2015, defendant (using the BBM screenname "El Primo Venansio") was intercepted in a conversation trying to sell a BMW X-4 that belonged to his wife to one of his drug trafficking associates in Mexico ("Cacho"):

El Primo Venansio:   Dip, do you want an X4 Sport BMW with 20' rims?  It's my wife's. 2015 with 3000 miles.

Cacho:               How much are you asking?

El Primo Venansio:   It is new.

El Primo Venansio:   Let me check how much I paid for it and I will tell you.  I will lose 16 percent of the VAT (tax).  It is nice.  This X4 model just came out this year.

Official vehicle title records from the State of Nuevo Leon, Mexico, obtained pursuant to an MLAT request, confirm that on September 22, 2014, a BMW X4 was registered in the name of defendant's wife. According to Kelly's Blue Book, a 2015 BMW X4 had a sticker price of over $45,600.

- Credit card billing information recovered from defendant's phone show that in May 2018, defendant made a monthly credit car payment in the amount of approximately $20,286.12.

- During their drug trafficking relationship, Villegas gave defendant a Hublot watch worth $20,000, and a Spanish mare worth approximately $12,000. Exhibit A, ¶ 8.

Multiple photographs recovered from defendant's phone corroborate the consistent information received form multiple different witnesses regarding defendant's wealth:







18 U.S.C. § 3572 lists the factors the Court should consider in determining whether to impose a fine. Among those factors are the defendant's financial resources and ability to pay, the need to deprive the defendant of illegally obtained gains from the offense, and whether restitution is imposed (a restitution obligation is a reason not to impose a fine if the fine would impair the defendant's ability to pay restitution). Guideline § 5E1.2 provides: "The district court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay a fine." *See also United States v. Bauer*, 129 F.3d 962, 964 (7th Cir. 1997) (defendant bears the burden of proving he lacks the financial means to pay a fine).

Because defendant has refused to cooperate with the Probation Office's financial investigation, he has not met his burden of proving he cannot pay a fine. *United States v. Young*, 66 F.3d 830, 839 (7th Cir. 1995) (defendant who refused to provide financial data to probation failed to meet his burden of proof that he was unable to pay fine; district court did not err in imposing fine and requiring defendant to pay it through the Inmate Financial Responsibility Program). Further, for the

14

reasons stated above, the § 3572 factors weigh heavily in favor of imposing a fine, as defendant appears to have the resources to pay it, there is a compelling need to deprive him of illegally obtained funds, and there is no restitution obligation in this case.

Further, substantial financial penalties have been or will be imposed on the manager/supervisors in this case who substantially profited from the conspiracy. *See United States v. Arredondo Alvarez*, 17 CR 316-1, R. 236 (preliminary order for a $400,000 personal money judgment); *United States v. Timothy Stalka*, 19 CR 423, R. 22, ¶¶ 17-18 (plea agreement with forfeiture provisions for $375,000 personal money judgment and several vehicles and an airplane used to transport drugs as part of the conspiracy). Failure to impose a penalty on defendant—the leader/organizer of the DTO and the one who undoubtedly profited the most—would lead to an unwarranted sentencing disparity.

Finally, criminal defendants should not be able to evade meaningful financial penalties simply by refusing to cooperate with the Probation Office. That is especially so in this case, where there is heightened need to deprive defendant of criminal gains and a substantial basis to believe he can easily pay. While the government acknowledges it may be difficult to enforce the fine given that defendant's assets are in Mexico, the fine would still impose a meaningful sanction. For example, it would prevent defendant from transferring assets to his only adult child who resides in the United States.

Based on the above, the Court should impose a fine of at least $1,500,000.

**D. Supervised Release**

Count One carries a mandatory term of supervised release of at least 5 years. 21 U.S.C. 841(b)(1)(A). The government agrees with the Probation Officer's recommendation to impose the mandatory minimum term of supervised release. Defendant is a citizen of Mexico and will be deported after serving his custodial term. The government therefore recommends that the Court impose only the recommended mandatory conditions, as well as discretionary condition 21 (surrender for deportation). The 3553(a) factors justify these conditions to deter defendant from trying to re-enter the United States after he is deported.

## III.    Conclusion

For the reasons stated above, the government respectfully asks this Court to impose a sentence of at least 400 months' imprisonment, a fine of at least $1,5000,000, and a supervised release term of 5 years.

Respectfully Submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ *Sean J.B. Franzblau*
       Sean J.B. Franzblau
       Assistant United States Attorney